Filed 5/16/14  P. v. Jester CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037592 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS102695A) |
| v. | |
| STEVEN ANTHONY JESTER, | |
| Defendant and Appellant. | |

A jury convicted defendant Steven Anthony Jester of attempting by threat or violence to deter the performance of an officer's duty (Pen. Code, § 69), failing to comply with a lawful order (Veh. Code, former § 2800, subd. (a)),[1] driving under the influence (DUI) (§ 23152, subd. (a)), and possessing marijuana while driving (§ 23222, subd. (b)).  An allegation that he willfully refused to submit to a chemical test (§ 23577, subd. (a)) was also found true.  The jury acquitted defendant of making criminal threats (Pen. Code, § 422).  The trial court suspended imposition of sentence and placed him on probation.

On appeal, defendant contends that (1) there was insufficient evidence to support his former section 2800 and Penal Code section 69 convictions and the section 23577 enhancement because the prosecution failed to prove the officer acted lawfully; (2) the

---

[1]     Further statutory references are to the Vehicle Code unless otherwise noted.

trial court prejudicially erred in failing to instruct the jury on "the element of lawfulness" and the elements of criminal trespass; (3) the trial court prejudicially misinstructed the jury on "the reach of Penal Code section 69;" (4) the trial court prejudicially erred in giving CALCRIM No. 225 instead of CALCRIM No. 224; (5) the trial court abused its discretion in allowing the "surprise testimony" of a 911 caller; (6) his defense counsel was prejudicially deficient; and (7) the cumulative effect of the trial court's errors denied him due process.  Defendant also asks us to independently review the transcript of the in camera hearing on his *Pitchess*[2] motion for discovery of police officer personnel records, which the trial court denied.  We affirm.

## I.  Background

California Highway Patrol (CHP) Officer Ben Grasmuck was on patrol in Big Sur around 4:45 p.m. on December 8, 2010.  He was traveling north on Highway 1 when he came upon defendant and another man standing on the shoulder in the middle of the Bixby Bridge.  Defendant was lowering something over the west side of the bridge as the other man video recorded his actions.  Grasmuck believed that defendant was about to bungee jump from the bridge.  He radioed for backup, stopped his patrol vehicle, activated its emergency lights, and told defendant over the P.A. system, " 'Don't even think about it' . . . .  'Pull your crap up.' "  As Grasmuck got out of his vehicle, defendant "jumped up on the bridge railing," lost his balance and fell back onto the roadway, and then climbed up again.  It "looked like he was going to parachute off the bridge."  Grasmuck put up his hand to stop an approaching pickup truck because he "was worried about [defendant] falling backwards in front of that truck."  "I was concerned about his safety.  I was concerned about traffic safety.  I didn't know what the guy with the camera

---

[2]     *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

was going to do." Grasmuck told defendant he would arrest him if he jumped. Defendant told him, "Sorry, but I gotta do it." "And then he jumped."

Grasmuck drove to the Bixby Bridge parking area. Videographer Tyler Mitchell was waiting there for defendant. When defendant returned, Grasmuck arrested him for disobeying a lawful order.

Grasmuck had noticed defendant's "red and watery" eyes before defendant jumped. He also "smelled a strong odor" of alcohol that he thought came from defendant. When he put defendant into the patrol vehicle, Grasmuck again noticed "the strong odor of an alcoholic beverage . . . ." Defendant's speech was slurred. His "eyes were red and watery." He was also "loud" and "argumentative." Defendant was "yelling" at Mitchell to film the encounter and "yelling" at Grasmuck that he could not arrest him for jumping off the bridge. Grasmuck had made over 1,200 DUI arrests and assisted in about 1,000 more in his 23 years with the CHP. He concluded that defendant was "very intoxicated" and told him he was also under arrest for DUI.

Officer John Correa responded to Grasmuck's call for backup. Correa did an inventory search of defendant's black Isuzu Trooper. He found two baggies of a substance that he recognized as marijuana in "the main pocket" of a backpack on the rear seat of the Isuzu.

Grasmuck transported defendant to the CHP office in Salinas. Defendant was "screaming" insults at him during the 90-minute drive. "And then he would calm down for a little while" and ask why Grasmuck arrested him. When Grasmuck repeated that defendant was under arrest for disobeying a lawful order, "for jumping off of the bridge, which is a trespassing charge," and for DUI, "that would send him up that ramp again." Defendant repeatedly threatened to "find [Grasmuck] later" and "fuck [him] up" but then apologized. He offered several times to give Grasmuck a free skydiving lesson if he let him go. Mood swings and threats are "not uncommon when you arrest somebody for drunk driving" but Grasmuck became concerned when defendant threatened his family.

3

Defendant said, "I'm gonna look you up on Facebook and I'm gonna find you. And then I'm going to come to your house, I'm gonna fuck you up." "I'm going to find you on the internet. I'm gonna find your wife. I'm gonna befriend her and I'm going to fuck her up the ass."

At the CHP office, Grasmuck told defendant that he was required to take a chemical test. Defendant "screamed back I wasn't driving, I was jumping off a bridge." Grasmuck read the requirement to defendant and asked again if he would submit to the test. "And he said no, fuck you."

Grasmuck testified at trial about what occurred that day. The jury viewed Mitchell's two videos and examined 28 photographs of the Bixby Bridge area. Grasmuck explained that there is no designated trail providing public access to the beach below the bridge. The area below the bridge and most of the land along Highway 1 in the area is privately owned. Grasmuck testified that "at the time, I thought the only way out was across private property up Bixby Creek. . . . But there was another way that was unknown to me at that time." Defendant returned from the beach that way.

Mitchell testified that defendant called him on December 8, 2010 from somewhere near Mitchell's house in Marina and asked if he wanted to go to Big Sur. Defendant appeared "normal" when he drove up about 20 minutes later. Mitchell denied telling Grasmuck that he smelled alcohol on defendant's breath when defendant picked him up. Mitchell had not used alcohol or drugs that day. Neither he nor defendant consumed alcohol during the drive to the bridge. Mitchell noticed defendant weaving "a little bit" as he drove and "maybe veer[ing] from the lane a little bit."

When they arrived at the bridge, defendant told Mitchell that there was alcohol in the truck and offered him some. Mitchell declined. He testified that defendant "was drinking a lot" for 10 or 15 minutes before he jumped. Defendant downed "multiple" glasses of an alcoholic beverage "[i]n gulps." Mitchell did not recall telling police that

4

defendant had nothing alcoholic to drink at the bridge or that they had been there just 10 minutes before Grasmuck arrived.

Correa testified that when he saw defendant's Isuzu in the Bixby Bridge parking area, he realized that the license plate number and vehicle description matched information he had heard in a "be on the lookout" broadcast earlier that afternoon. "It was the same plate."

CHP public safety dispatch supervisor Nicole Stewart authenticated the recording of a 911 call made by Edward Arratia at 2:28 p.m. on December 8, 2010. The recording was played for the jury. Arratia testified that he was driving south on Highway 1 near Moss Landing. He was "right behind" a black SUV that was "more than swerving. It was actually gonna cause an accident." The driver "kind of lost it" on a curve, braked "really hard," and "almost rear-ended" the car in front of him. The SUV "kind of drifted slightly into the other lane" and "hit the yellow—the center divider." Arratia was behind the SUV from a quarter of a mile north of Moss Landing "[p]retty much [to] the . . . Castroville/Salinas exit . . . ." The driver "was still continuing swerving" and was "weaving a little bit." "He kind a [*sic*] got a little bit better when he got on the straighter road" but "he was still swerving."

Defendant's former coworker Leandro Tompkins testified for the defense. Tompkins had known defendant for about five years and had "never" seen him violent.

Defendant testified in his own behalf. He told the jury that he had nothing to drink that day until he "first got to the bridge." He "didn't even know there was booze in the car." He did not recall a near-collision. He had one or "possibly two" glasses of an alcoholic beverage at the bridge. He drank them "quickly" because "I'm an alcoholic." He was feeling the effects of the alcohol by the time Grasmuck arrived. Defendant admitted "insulting" Grasmuck during the ride to the CHP office but denied threatening him or his wife. He labeled Grasmuck's testimony on that point "a complete fabrication."

5

The jury deliberated for about three and a half hours before returning an acquittal on the Penal Code section 422 count, guilty verdicts on the remaining counts, and a true finding on the enhancement allegation. The trial court suspended imposition of sentence and placed defendant on probation. Defendant filed a timely notice of appeal.

## II. Discussion

### A. Sufficiency of the Evidence

Defendant claims there was insufficient evidence to support his former section 2800 and Penal Code section 69 convictions and the section 23577 enhancement because the prosecution failed to prove that Grasmuck acted lawfully. We disagree.

"The law we apply in assessing a claim of sufficiency of the evidence is well established: ' " ' " [T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " ' [Citation.] The standard is the same under the state and federal due process clauses. [Citation.] 'We presume " 'in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] This standard applies whether direct or circumstantial evidence is involved." [Citation.]' [Citation.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294.) "Reversal . . . is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

### 1. Former Section 2800 Conviction

Defendant argues that there was insufficient evidence to support his former section 2800, subdivision (a) conviction because there was no evidence that Grasmuck's orders to get down from the bridge railing and not to jump were lawful. The argument lacks merit.

6

Former section 2800, subdivision (a) provided in relevant part that "[i]t is unlawful to willfully fail or refuse to comply with a lawful order, signal, or direction of a peace officer . . . when that peace officer is in uniform and is performing duties pursuant to any of the provisions of this code." (Former § 2800, subd. (a).) "[T]he express language of section 2800, authorizing traffic officers to make 'an order, signal, or direction' the disobedience of which is illegal, is limited to lawful orders, willfully disregarded or disobeyed." (*People v. Ritter* (1980) 115 Cal.App.3d Supp. 1, 6 (*Ritter*).) A "'lawful order' [is] a reasonable order made by a traffic officer which is reasonably necessary to aid him in the performance of his duty to enforce 'the rules of the road.'" (*Id.* at p. 4.)

CHP officers are peace officers whose primary duty is "the enforcement of any law relating to the use or operation of vehicles upon the highways, or laws pertaining to the provision of police services for the protection of state officers, state properties, and the occupants of state properties, or both . . . ." (Pen. Code, § 830.2, subd. (a); § 2409.) They "are authorized to direct traffic according to law, and . . . to expedite traffic or insure safety, may direct traffic as conditions may require notwithstanding the provisions of [the Vehicle] code." (§ 2410.) "[T]raffic" includes "pedestrians . . . ." (§ 620.)

Here, Grasmuck testified that there is "a road cut [on Highway 1] where you . . . come down from Hurricane Point and around the corner and suddenly . . . you're just on the southern approach to the bridge." When he saw defendant and Mitchell on the bridge, Grasmuck's immediate concerns were "[t]raffic" and "[defendant's] safety." He saw defendant "fall back off the bridge rail into the roadway." He was also concerned about Mitchell. He "didn't want [approaching cars] to hit him while they were watching [defendant] and myself." Grasmuck stopped his patrol vehicle where it would be most visible to approaching motorists and activated its emergency lights. He put up his hand to stop oncoming traffic as he walked toward defendant. He instructed defendant to "get down" and "come on down." Grasmuck was expediting traffic and ensuring public safety

7

when he ordered defendant to get down from the railing and not to jump. (§ 2410.) Defendant was creating a traffic hazard that endangered himself, Mitchell, and passing motorists. The videos that the jury viewed made this apparent. They showed a narrow mountain roadway with traffic edging over the yellow line to avoid defendant as he walked on the bridge, not always on the narrow shoulder but sometimes in the roadway. Defendant's left arm extended horizontally into the path of traffic at times. He dropped his parachute over the railing at the midpoint of the bridge, climbed onto the rail, fell back onto the roadway, and then clambered back up as Grasmuck approached with his hand extended to stop oncoming cars.

We reject defendant's assertion that any traffic problems or safety issues were created by Grasmuck. The video established that defendant created a dangerous distraction. It showed him dressed in shorts and a t-shirt as he balanced on the railing with his parachute dangling out of sight below the roadway. The parachute harness was not so obvious that it would have been immediately apparent to drivers suddenly confronted with the sight of a man poised precariously on a bridge railing hundreds of feet above the rocks and beach below. The distraction would have been amplified when defendant suddenly somersaulted off the bridge because motorists would not have seen the parachute that dangled below the roadway and it would not have opened until defendant was out of their sight.

Substantial evidence thus supported conclusions that defendant created a traffic hazard and that Grasmuck acted within his lawful authority to ensure defendant's, Mitchell's, and the public's safety when he ordered defendant to get down from the railing and not to jump. (§ 2410; *Ritter*, *supra*, 115 Cal.App.3d Supp. at p. 4.) Grasmuck's orders were lawful. (*Ritter*, at p. 4.) Defendant does not challenge the sufficiency of the evidence to support a conclusion that he willfully failed to comply with Grasmuck's orders. (Former § 2800, subd. (a).) Nor does he deny that Grasmuck was in

8

uniform when he issued them. (*Ibid.*) It follows that sufficient evidence supported defendant's former section 2800, subdivision (a) conviction.

Defendant argues that Grasmuck "unambiguously testified that the sole basis for his order . . . not to jump was that he thought [defendant] would be trespassing if he landed on the beach." The record does not support this overbroad assertion. After Grasmuck testified that his immediate concerns when he saw defendant and Mitchell on the bridge were "[t]raffic" and "safety," he was asked why he told defendant not to jump. He replied that it was "not legal to jump off of that bridge because . . . at the time, I thought the only way out was across private property . . . ." The questioning then returned to his traffic safety concerns. Grasmuck did not testify that the sole basis for his order was his belief that defendant would have to trespass over private property to get back to the roadway, nor can any such conclusion be inferred on this record.

### 2. DUI Conviction and Chemical Testing Enhancement

Defendant claims there was insufficient evidence to support his DUI conviction because Grasmuck did not see him driving. He reasons that this means there was insufficient evidence to support a true finding on the enhancement allegation since his arrest for DUI was unlawful. We disagree.

Penal Code former section 836 provided that "[a] peace officer may arrest a person in obedience to a warrant, or . . . without a warrant, may arrest a person when any of the following circumstances occur: [¶] (1) The officer has probable cause to believe that the person to be arrested has committed a public offense in the officer's presence. [¶] (2) The person arrested has committed a felony, although not in the officer's presence. [¶] (3) The officer has probable cause to believe that the person to be arrested has committed a felony, whether or not a felony, in fact, has been committed." (Pen. Code, former § 836, subd. (a).) Penal Code former section 836 generally precludes warrantless arrests for misdemeanors and infractions not committed in an officer's presence but "[t]he Legislature has provided exceptions to this requirement." (*People v.*

9

*Schofield* (2001) 90 Cal.App.4th 968, 969 (*Schofield*), disapproved on another ground in *People v. Thompson* (2006) 38 Cal.4th 811, 828, fn. 3 (*Thompson*).) "In 1969, the Legislature enacted Vehicle Code section 40300.5," which provides in pertinent part that " '[i]n addition to the authority to make an arrest without a warrant pursuant to paragraph (1) of subdivision (a) of Section 836 of the Penal Code, a peace officer may, without a warrant, arrest a person when the officer has reasonable cause to believe that the person had been driving while under the influence of an alcoholic beverage . . . when the following exists: [¶] . . . [¶] (e) The person may destroy or conceal evidence of the crime unless immediately arrested.' " (*Schofield*, at pp. 972-973; § 40300.5, subd. (e).) The statute's reach is not limited to situations in which the defendant intentionally or willfully destroys or conceals evidence. Section 40300.5, subdivision (e) also "creates an exception to the presence requirement . . . because evidence will be destroyed by the simple passage of time unless the person is immediately arrested." (*Schofield*, at pp. 974-975; see *Thompson*, at pp. 824-825 [holding that the metabolization of alcohol qualified as imminent destruction of evidence justifying warrantless entry to arrest DUI suspect].)

The issue here is whether Grasmuck had "reasonable cause to believe [defendant] had been driving while under the influence of an alcoholic beverage . . . ." (§ 40300.5, subd. (e); *Schofield*, *supra*, 90 Cal.App.4th at p. at p. 970.) He did. He saw defendant climb onto the bridge rail, lose his balance, and fall back into the roadway. He noticed defendant's "red and watery" eyes and detected a strong odor of alcohol that he initially thought and later confirmed came from defendant. He observed that defendant was "argumentative" and "loud," that his speech was slurred, and that he was "somewhat" incoherent. Ample evidence thus supported a conclusion that defendant was "very intoxicated." Ample evidence also supported a conclusion that defendant had driven to the bridge in that condition. Mitchell told Grasmuck that he smelled alcohol on defendant's breath when defendant picked him up in Marina, that defendant drove them

to the bridge, that they did not drink alcohol in the car, and that defendant had nothing to drink after they arrived at the bridge.

Because Grasmuck had "reasonable cause to believe that [defendant] had been driving while under the influence of an alcoholic beverage . . . ," the DUI arrest to preserve evidence that might otherwise have been destroyed was lawful. (§ 40300.5, subd. (e); *Schofield*, *supra*, 90 Cal.App.4th at p. at p. 970.) Because the DUI arrest was lawful, defendant was required to submit to chemical testing. (§ 23612, subd. (a)(1)(A) ["A person who drives a motor vehicle is deemed to have given his or her consent to chemical testing of his or her blood or breath for the purpose of determining the alcoholic content of his or her blood, if lawfully arrested for any offense allegedly committed in violation of Section . . . 23152 . . . ."].)

Section 23577 provides that "[i]f any person is convicted of [DUI], and at the time of the arrest leading to that conviction that person willfully refused a peace officer's request to submit to . . . the chemical test or tests pursuant to Section 23612, the court shall impose [certain enhancements]." (§ 23577, subd. (a).) "The willful refusal or failure to complete the chemical test required pursuant to Section 23612 shall be pled and proven." (§ 23577, subd. (b).)

Here, Grasmuck testified that he read the chemical testing requirement to defendant and asked him if he would submit to the test. Defendant "said no, fuck you." This was plainly a "willful refusal" to complete the test. (§ 23577, subd. (b).) Thus, sufficient evidence supported the jury's true finding on the section 23577 enhancement allegation.

### 3. Penal Code Section 69 Conviction

Defendant argues that there was insufficient evidence to support his conviction for attempting by threat to deter the performance of an officer's duty (Pen. Code, § 69) because there was no evidence that he specifically intended to deter Grasmuck's lawful conduct. We cannot agree.

11

Penal Code section 69 prescribes punishment for any attempt "by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law . . . ." (Pen. Code, § 69.) "A threat, unaccompanied by any physical force, may support a conviction for the first type of offense under section 69." (*In re Manuel G.* (1997) 16 Cal.4th 805, 814 (*Manuel G.*).) But the statute requires more than a threat. (*People v. Superior Court (Anderson)* (1984) 151 Cal.App.3d 893, 897.) "Indeed, its central requirement is an *attempt to deter the executive officer*." (*Ibid.*) A threat of unlawful violence "is merely the means by which the attempt is made." (*Manuel G.*, at p. 815.) Penal Code section 69 "encompasses attempts to deter *either* an officer's *immediate* performance of a duty imposed by law *or* the officer's performance of such a duty at some time *in the future*." (*Manuel G.*, at p. 817.) It "does not reach threats made only in . . . retaliation for an officer's *past* performance of his or her duties." (*Id.* at p. 817, fn. 6.) "[A] violation of section 69 requires a specific intent to interfere with the executive officer's performance of his duties . . . ." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1153-1154.)

Defendant insists that specific intent was lacking here because "[m]entally, he was focused backward in time, responding to or retaliating for [Grasmuck's] *past* and *illegal* conduct in arresting him." The record does not support this assertion.

Grasmuck testified that defendant's first threat was delivered as they were "going up Laureles Grade Road." "He said something like I'm gonna fuck you up. I'm gonna find you later, I'm gonna fuck you up." During the same portion of the drive to the CHP office in Salinas, defendant offered to give Grasmuck a free skydiving lesson "'if you let me go.'" The temporal proximity of the two statements supported a conclusion that defendant made both with the same intent. That intent was to get out of the predicament he found himself in. The jury could reasonably have concluded from this circumstantial evidence that when defendant's effort to bribe Grasmuck failed to effect his release, defendant turned to threats of violence. Substantial evidence thus supported a finding

12

that defendant voiced his threats with the requisite specific intent to deter Grasmuck from performing his official duties. Defendant's Penal Code section 69 conviction was supported by sufficient evidence.

## B. Claimed Instructional Errors

### 1. Definition of "Lawfulness"

Defendant argues that his former section 2800 and Penal Code 69 convictions and the true finding on the section 23577 enhancement allegation must be reversed "because the jury received *no instruction* to guide them in determining the common element of lawfulness." He maintains that "[d]epending as the trial court did solely on the language of the statutes was inadequate because lawfulness can only be determined by reference to principles of constitutional law governing illegal detentions, unlawful warrantless arrests, and the use of tainted evidence derived from them." We disagree.

Our review is de novo. "Whether or not to give any particular instruction in any particular case entails the resolution of a mixed question of law and fact that, we believe, is . . . predominantly legal. As such, it should be examined without deference." (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)

"In a criminal case, a trial court has a duty to instruct the jury on ' " " ' "the general principles of law relevant to the issues raised by the evidence." ' " ' [Citation.] The 'general principles of law governing the case' are those principles connected with the evidence and which are necessary for the jury's understanding of the case. [Citations.]" (*People v. Estrada* (1995) 11 Cal.4th 568, 574 (*Estrada*).) The trial court has a duty to instruct the jury on the essential elements of the charged offense even without a request by the defendant. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1311.)

Generally, " '[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Sully* (1991) 53

Cal.3d 1195, 1218.) "'[T]he language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification. If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language.'" (*Estrada*, *supra*, 11 Cal.4th at p. 574.)

Defendant's assertion that the jury was not instructed on the element of lawfulness is incorrect. An instruction that tracked the language of CALCRIM No. 2656 told the jury with respect to the former section 2800, subdivision (a) count that "[t]he defendant is charged in Count 4 with failing to comply with *a lawful order* of a uniformed peace officer, in violation of . . . section 2800(a)." (Italics added.) The same instruction told the jury that "[t]o prove that the defendant is guilty of this crime, the People must prove that, one, Officer Grasmuck was a peace officer *lawfully performing or attempting to perform his duties pursuant to the Vehicle Code*; two, the officer was in uniform; and three, the defendant willfully failed or refused to comply with *a lawful order or direction of the peace officer.*" (Italics added.) The relevant portion of the instruction on the Penal Code 69 count told the jury that "[t]o prove that the defendant is guilty of this crime, the People must prove that, one, the defendant willfully and unlawfully used violence or a threat of violence to try to prevent or deter an executive officer from performing *the officer's lawful duty*, and two, when the defendant acted he intended to prevent or deter the executive officer from performing *the officer's lawful duty . . . .*" (CALCRIM No. 2651, italics added.) The instruction on the section 23577 enhancement allegation told the jury that the prosecution had to establish that "the peace officer *lawfully arrested* the defendant . . . ." (Italics added.)

Defendant does not contend that any of these instructions incorrectly stated the law. He did not challenge them below. Nor did he request the amplifying or clarifying instruction that he now urges should have been given. His failure to do so forfeited the argument. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1020-1021 (*Jenkins*) [contentions

14

that trial court "failed to define adequately what constituted an officer's lawful performance of his or her duties" and "should have expanded upon the definition of 'performance of official duties' " held "waived, because defendant did not request such a clarification below."].)

Defendant urges that the trial court had a sua sponte obligation to instruct the jury with CALCRIM No. 2670. He argues that the court's failure to do so "unconstitutionally relieved the prosecution of its obligation to prove the essential element of lawfulness beyond a reasonable doubt." We disagree.

CALCRIM No. 2670 instructs the jury that the People have the burden of proving beyond a reasonable doubt that an officer was lawfully performing his duty and that an officer is not lawfully performing his duty "if he . . . is unlawfully arresting or detaining someone" or "using unreasonable or excessive force when making or attempting to make an otherwise lawful arrest or detention." (CALCRIM No. 2670.) The bench notes state that "[t]he court has a sua sponte duty to give this instruction if there is sufficient evidence that the officer was not lawfully performing his or her duties and lawful performance is an element of the offense." (Bench Notes to CALCRIM No. 2670 (2012 ed.) pp. 597-598.) This instruction is in accord with California Supreme Court precedent holding that "[d]isputed facts relating to the question whether the officer was acting lawfully are for the jury to determine . . . ." (*Jenkins*, *supra*, 22 Cal.4th at p. 1020; see also *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1217 ["disputed facts bearing on the issue of legal cause must be submitted to the jury considering an engaged-in-duty element"].)

Here, there were no disputed facts relating to the lawfulness of Grasmuck's actions for the jury to resolve. Defendant did not challenge the lawfulness of Grasmuck's orders at trial. Nor did he challenge the legality of his detention and arrest for refusing to comply with those orders. He did not challenge the lawfulness of his other arrests or rely on a fruit of the poisonous tree theory at trial. There is no substantial evidence in the

15

record to support any of those theories. "'[A] trial judge must only give those instructions which are supported by substantial evidence. [Citations.]'" (*People v. Roldan* (2005) 35 Cal.4th 646, 715 (*Roldan*), disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "A party is not entitled to an instruction on a theory for which there is no supporting evidence." (*People v. Memro* (1995) 11 Cal.4th 786, 868 (*Memro*), overruled on another point in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2.) On this record, the trial court's obligation to instruct the jury with CALCRIM No. 2670, which explains when an arrest or detention is unlawful, was never triggered.

Defendant urges that the trial court had a sua sponte duty to instruct the jury with CALCRIM No. 2670 because "[i]t is undeniably 'error not to submit all elements of a charged offense to the jury, regardless of the state of the evidence.' [Citation.]" The argument lacks merit. The jury was instructed on the elements of each offense. We have determined that absent a request by defendant to augment those instructions and without sufficient evidence that Grasmuck was not lawfully performing his duties, the trial court had no obligation to instruct the jury with CALCRIM No. 2670. (*Roldan*, *supra*, 35 Cal.4th at p. 715.)

Defendant's reliance on dictum in *People v. Wilkins* (1993) 14 Cal.App.4th 761 (*Wilkins*) is misplaced. In *Wilkins*, the prosecution relied at trial on exigent circumstances and consent to justify a warrantless entry. (*Id*. at pp. 767, 771, 777, fn. 8, 780.) Both theories were supported by substantial evidence. (*Ibid*.) The state of the evidence in *Wilkins* thus required sua sponte instruction on exigent circumstances and valid consent as "material constituent[s] of an element necessary for conviction." (*Id*. at p. 777 & fn. 8.) Not so here. Unlike in *Wilkins*, there was no substantial evidence to support the sua sponte instruction that defendant claims was required. *Wilkins* is inapposite.

## 2. Penal Code Section 69 Instructions

Defendant argues that "if it had not been obvious to the trial court before," a jury question during deliberations "should certainly have alerted it to the need to provide more complete instruction" on the Penal Code section 69 count. We cannot agree. The note said, "We need more information about the actions leading to Mr. Jester being charged with count #1 Penal Code Section 69. When did this offense take place?" We do not read the note as a plea for "more complete instruction." It seeks clarification of the facts, not the law. Because the jury's task is to determine the facts, the trial court appropriately responded, "You have heard and received all the evidence. You can use any and all evidence received during the trial to determine if any conduct or actions by the Defendant . . . constitute a violation of P.C. 69."

In his reply brief, defendant asserts that he "argued below" that the trial court's failure to instruct the jury sua sponte on "the technical legal terms of 'trespass,' 'lawful,' and 'lawfulness,' all in the context of the officer detaining and arresting [defendant], and of [defendant's] verbal threats related to that conduct, constituted prejudicial instructional error in violation of the Fifth, Sixth, and Fourteenth Amendments to the Constitution, subject to *Chapman* harmless error analysis." Defendant's assertion is incorrect. He made no such argument in the trial court, as he expressly concedes in his opening brief on appeal. Even if we assume that he preserved the argument, it is simply another iteration of his claim that his initial encounter with Grasmuck was an illegal detention that set in motion a chain reaction that obligated the trial court to instruct the jury sua sponte with CALCRIM No. 2670. We have already rejected that argument.

Defendant claims the trial court prejudicially misinstructed the jury on "the reach of Penal Code section 69 . . . ." He quotes snippets of CALCRIM No. 2651 out of context to support his argument that the instruction "made no reference to the essential requirement of lawfulness in the exercise of discretion and the performance of official

17

duties." He contends that the misinstruction "allowed the jury to convict [him] even if the officer was 'performing his duties' unlawfully, or in the past." We disagree.

"'[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citation.]" (*People v. Harrison* (2005) 35 Cal.4th 208, 252.) "We presume that jurors are intelligent and capable of understanding and applying the court's instructions. [Citation.]" (*People v. Butler* (2009) 46 Cal.4th 847, 873.) "A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]" (*People v. Cross* (2008) 45 Cal.4th 58, 67-68 (*Cross*).)

Here, the court gave the standard instruction. The jury was instructed that "[t]he defendant is charged in Count 1 with trying to prevent or deter an executive officer from performing the officer's duty, in violation of Penal Code [s]ection 69. [¶] To prove that the defendant is guilty of this crime, the People must prove that, one, the defendant willfully and unlawfully used violence or a threat of violence to try to prevent or deter an executive officer from performing the officer's lawful duty, and two, when the defendant acted he intended to prevent or deter the executive officer from performing the officer's lawful duty. [¶] Someone commits an act willfully when he or she does it willingly or on purpose. [¶] An executive officer is a government official who may use his or her own discretion in performing his or her job duties. A sworn peace officer is an executive officer. [¶] The executive officer does not need to be performing his or her duties at the time the threat is communicated. [¶] A threat may be oral or written and may be implied by a pattern of conduct or a combination of statements and conduct. [¶] Someone who intends that a statement be understood as a threat, does not have to actually intend to carry out the threatened fact. [¶] A sworn member of the [CHP] is a peace officer." (CALCRIM No. 2651.)

18

In our view, the structure of the instruction defeats defendant's argument that it "allowed the jury to convict [him] even if the officer was 'performing his duties' unlawfully, or in the past . . . ." The instruction first described the elements of the offense. It correctly informed the jurors that the prosecution had to prove that defendant willfully and unlawfully threatened an officer in an attempt to deter him "from performing the officer's lawful duty" and that he acted with the intent to deter the officer "from performing the officer's lawful duty." In separate and subordinate paragraphs, the instruction then defined "willfully" and "executive officer" and explained that the officer did not have to be performing his duties when the threat was communicated. No rational juror would have interpreted the definition of "executive officer" to suggest that Grasmuck had discretion to perform his duties unlawfully. Nor can the instruction be read to suggest that defendant could be convicted for attempting to deter Grasmuck's past performance of his duties. It is impossible to deter conduct that has already occurred. Thus, it is not reasonably likely that the jury would have interpreted the instruction in the way defendant suggests. His argument fails. (*Cross*, *supra*, 45 Cal.4th at pp. 67-68.)

Defendant complains that the court gave a "truncated" version of CALCRIM No. 2651. We assume he is referring to the trial court's omission of optional language that explains that "[a] peace officer is not lawfully performing his or her duties if he or she is (unlawfully arresting or detaining someone/ [or] using unreasonable or excessive force in his or her duties). . . ." (CALCRIM No. 2651.) The optional language is appropriately included when lawful performance is an issue. (Bench Notes to CALCRIM No. 2651 (2012 ed.) p. 569.) Here, lawful performance was not an issue. Thus, the trial court properly omitted the optional language.

### 3. Circumstantial Evidence Instructions

Although both sides agreed below that CALCRIM No. 225 (circumstantial evidence: intent or mental state) was the appropriate instruction, defendant now contends

that the trial court should have given CALCRIM No. 224 (circumstantial evidence: sufficiency of evidence) instead. We disagree.

"An instruction on the principles contained in [CALCRIM No. 224] 'must be given sua sponte when the prosecution substantially relies on circumstantial evidence to prove guilt. [Citations.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 885 (*Rogers*).) "[B]ut it should not be given where the evidence relied on is either direct or, if circumstantial, is not equally consistent with a reasonable conclusion of innocence." (*People v. Heishman* (1988) 45 Cal.3d 147, 167 (*Heishman*); *People v. Wiley* (1976) 18 Cal.3d 162, 174-176 (*Wiley*).) Nor is it required "where the alleged circumstantial evidence is incidental to, and corroborative of, direct evidence." (*People v. Malbrough* (1961) 55 Cal.2d 249, 250-251 (*Malbrough*).) "CALCRIM Nos. 224 and 225 provide essentially the same information on how the jury should consider circumstantial evidence, but CALCRIM No. 224 is more inclusive." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1172 (*Samaniego*);[3] see *People v. Cole* (2004) 33 Cal.4th 1158, 1222 (*Cole*).) "CALCRIM No. 225 is to be used in place of CALCRIM No. 224 'when the defendant's specific intent or mental state is the only element of the offense that rests substantially or entirely on circumstantial evidence.' [Citations.]" (*Samaniego*, at pp. 1171-1172; see *Cole*, at p. 1222.)

### a. DUI and Circumstantial Evidence

Defendant argues that the trial court should have instructed the jury with CALCRIM No. 224 because "the prosecution relied exclusively on circumstantial

---

[3] "CALCRIM Nos. 224 and 225 are substantially the same as their predecessors, CALJIC Nos. 2.01 and 2.02. In each pair, the lower numbered instruction informs the jury as to how to consider circumstantial evidence to find the defendant guilty, and the higher numbered instruction informs the jury on how to consider circumstantial evidence when only the element of mental state or intent has been proven by such evidence. Authorities discussing these CALJIC instructions are therefore instructive with regard to the analogous CALCRIM instructions." (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1171, fn. 12.)

evidence" to prove the DUI charge. The Attorney General disagrees. She maintains that the prosecution relied primarily on direct evidence. We agree with the Attorney General.

To prove the DUI charge, the prosecution had to establish that defendant drove a vehicle while under the influence of an alcoholic beverage. (CALCRIM No. 2110; *People v. McNorton* (2001) 91 Cal.App.4th Supp. 1, 5.) The prosecution relied primarily on direct evidence to establish both elements. Arratia's testimony, the recording of his 911 call, and the computer printout of that call established that the driver of the car Arratia observed on Highway 1 near Moss Landing was impaired in some way, although it did not establish the nature of the impairment. Correa's testimony established that the black Isuzu he saw at the bridge was the same car Arratia reported to police. Defendant admitted that he was the driver of that car.

Ample direct evidence, including the videos, Grasmuck's testimony, and defendant's own admissions, established that defendant was intoxicated at the bridge. Mitchell's observations provided a direct evidence link between defendant's intoxication at the bridge and his prior driving. Mitchell told Grasmuck that he smelled alcohol on defendant's breath when defendant picked him up, that he noticed him weaving "a little bit" and "maybe veer[ing] from the lane a little bit" on the drive to the bridge, that they did not drink alcohol during the drive, and that defendant had nothing to drink at the bridge. Thus, there was sufficient direct evidence to establish the elements of the DUI offense.

Circumstantial evidence corroborated the conclusion that defendant drove while under the influence of alcohol. It did so by supporting a reasonable inference that defendant was under the influence when Arratia encountered him. Mitchell's statement to Grasmuck that he smelled alcohol on defendant's breath when defendant picked him up in Marina permitted an inference that the impaired driving Arratia observed near Moss Landing before defendant picked Mitchell up was caused by intoxication rather than by some other factor. The inference was bolstered by Mitchell's testimony that he did not

21

see alcoholic beverages in the car when defendant picked him up and that he noticed defendant weaving "a little bit" and "maybe veer[ing] from the lane a little bit" on the remainder of the drive although neither of them drank alcohol in the car. Defendant's testimony that he was an alcoholic further supported an inference that intoxication caused the impaired driving that Arratia reported. Instruction with CALCRIM No. 224 is not required where circumstantial evidence is "incidental to, and corroborative of, direct evidence," as was the case here. (*Malbrough*, *supra*, 55 Cal.2d at pp. 250-251.)

Instruction with CALCRIM No. 224 is also not required where the evidence relied on, "if circumstantial, is not equally consistent with a reasonable conclusion of innocence." (*Heishman*, *supra*, 45 Cal.3d at p. 167; *Wiley*, *supra*, 18 Cal.3d at pp. 174-176.) There was no such consistency here. The evidence pointing to defendant's guilt was strong. He did not suggest an alternate inference to be drawn from any of the circumstantial evidence presented at trial. Instead, he denied having anything alcoholic to drink before he set out that day. He testified that he did not recall having difficulty keeping his car from swerving on Highway 1 in the area of Moss Landing. He did not recall having to brake suddenly or almost colliding with another car. "Defendant's testimony that he could not remember was not inconsistent with the evidence of guilt." (*Rogers*, *supra*, 39 Cal.4th at p. 886.) On this record, the circumstantial evidence that the prosecution relied on to prove the DUI charge was not equally susceptible of a reasonable interpretation pointing to defendant's innocence. Instruction with CALCRIM No. 224 was not required. (*Heishman*, at p. 167; *Wiley*, at pp. 174-176.)

Although he made no such argument at trial, defendant now argues that his impaired driving "was as reasonably attributable to [his] use of his cell phone to call Mitchell, which the other evidence showed occurred at the same time." The record cites that he relies on refer to the post-arrest call that he made to Mitchell from the CHP office much later that day. The record does not reveal the time of defendant's earlier call to Mitchell or where he placed that call from. The call was brief. Mitchell testified that

22

defendant asked him if he wanted to go to Big Sur and "[t]hat was it." Mitchell estimated that defendant arrived at his house in Marina about 20 minutes later. Defendant cites no other evidence to support his argument.

The evidence that defendant relies on does not support a reasonable inference that his impaired driving was attributable to his cell phone call to Mitchell. Without more details, defendant's assertion is entirely speculative. On these facts, the trial court had no sua sponte duty to instruct the jury with CALCRIM No. 224. (*Heishman*, *supra*, 45 Cal.3d at p. 167; *Wiley*, *supra*, 18 Cal.3d at pp. 174-176.)

### b. Marijuana Possession and Circumstantial Evidence

Defendant argues that the trial court should have given CALCRIM No. 224 because "the prosecution relied exclusively on circumstantial evidence" to prove the marijuana possession charge. The Attorney General counters that while circumstantial evidence was used to prove the charge, "the only issue was whether defendant in fact possessed the marijuana, which was directly dependent on his own assertions that he did not know [it] was in his backpack. Thus, the question was one of knowledge, properly invoking the mental state instruction under CALCRIM No. 225." We agree with the Attorney General.

To establish defendant's violation of section 23222, subdivision (b), the prosecution had to prove (1) that he possessed a controlled substance, (2) that he knew of its presence, (3) that he knew of its nature or character as a controlled substance, (4) that he knew the controlled substance was marijuana, (5) that the controlled substance was in a usable amount, and (6) that he possessed it while driving a motor vehicle. (CALCRIM No. 2304.) Direct evidence established all but the knowledge element. Correa testified that he found two baggies containing what he recognized as marijuana in a backpack on the back seat of defendant's Isuzu. Department of Justice criminalist Rachel Frase testified that the substance tested positive for marijuana and constituted a usable quantity. Mitchell testified that the backpack in which the marijuana was found was in the back

23

seat of the Isuzu when defendant picked him up in Marina and that he "believe[d]" the backpack belonged to defendant. Defendant and Mitchell testified that defendant drove alone in the Isuzu to Mitchell's house in Marina and then drove them both to the Bixby Bridge.

Neither defendant nor Mitchell was asked about the marijuana at trial. The prosecution relied on circumstantial evidence to establish defendant's knowledge of its existence and nature. In closing argument, the prosecutor urged the jury to "look at the circumstances and draw a reasonable inference. [¶] One such to be drawn here is that the person who owns the backpack knows what's in it. This is a backpack that's in the backseat [*sic*] of a car he's driving, has control over. It's full of his equipment, his jump equipment. That's his backpack. He has reason to know what's in it."

But that was not the only reasonable inference to be drawn from the evidence. Defendant testified that he "assumed" the backpack in the back of the Isuzu belonged to his roommate. He said that he "didn't even know there was booze in the car until we got there and in this backpack, like I said, there was a half gallon of vodka . . . ." If the jury believed defendant's testimony, it would have supported an inference that defendant did not discover the marijuana in the backpack until he arrived at the bridge.

Since the knowledge elements of the marijuana possession charge rested substantially or entirely on circumstantial evidence that was equally consistent with a reasonable conclusion of guilt or innocence, the trial court properly instructed the jury with CALCRIM No. 225. (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1171; *People v. Yrigoyen* (1955) 45 Cal.2d 46, 49.) Because the other elements of the charge rested substantially or entirely on direct evidence, the court did not err in failing to instruct the jury with CALCRIM No. 224. (*Heishman*, *supra*, 45 Cal.3d at p. 167; *Wiley*, *supra*, 18 Cal.3d at pp. 174-176.)

We reject defendant's argument that the failure to give CALCRIM No. 224 "could not but violate [his] substantial and fundamental constitutional right to due process." As

24

the California Supreme Court explained in *Rogers*, "Insofar as the federal Constitution itself does not require courts to instruct on the evaluation of circumstantial evidence where, as here, the jury properly was instructed on reasonable doubt [citations], defendant's claim necessarily rests on the asserted arbitrary denial of a state-created liberty interest. [Citation.] We doubt the common law right to a circumstantial evidence instruction rises to the level of a liberty interest protected by the due process clause. [Citation.]" (*Rogers*, *supra*, 39 Cal.4th at pp. 886-887.)

Here, the jury was properly instructed with CALCRIM Nos. 103 and 220 on the presumption of innocence, the prosecution's burden of proof, and reasonable doubt. Defendant's due process rights were not violated. (*People v. McKinnon* (2011) 54 Cal.4th 610, 677; *Rogers*, *supra*, 39 Cal.4th at pp. 886-887.)

## C. Admission of 911 Caller's Testimony

Defendant argues that the trial court abused its discretion and violated his right to due process when it denied his motion to exclude Arratia's "surprise" testimony or, alternatively, to continue the trial. We disagree.

### 1. Background

Early on the second day of trial and before opening statements were given, the prosecutor informed the trial court that after court the previous evening he learned for the first time about the "be on the lookout" broadcast that Correa heard several hours before defendant's arrest. The prosecutor promptly asked Grasmuck to locate the witness whose 911 call triggered the broadcast. Grasmuck interviewed Arratia later that evening. The prosecutor represented that "[t]hat was my first knowledge about the existence of that witness." He told the court that he had already given the defense copies of the CAD [computer assisted dispatch] printout and Grasmuck's supplemental report. He asked that Arratia be permitted to testify. The defense moved to exclude the evidence as "late

25

discovery," arguing that the CHP had the information all along and should have included it in its original report.

The trial court responded that "things come up" in jury trials despite the parties' best efforts to prepare their cases. The court remarked that it saw little difference between "the character witness [the defense] provided Friday and this type of witness." The court told the defense that information about Tomkins was in defendant's possession, "[s]o you can't say, well, I didn't have it but my client had it. Well, [the prosecutor] didn't have this information but his investigating officer had it or had access to it. . . . [¶] I believe both of you in good faith do your best to prepare your cases and in particular this case, and unfortunately, things come up." "In a perfect world, I guess we could say, well, we should [have done] all this six months ago . . . . I just don't think that's a very practical position for a court to take. [¶] . . . I don't think there's any personal game playing going on. I don't think either of you intentionally failed to disclose any of this information. [¶] . . . [¶] So the question then becomes how do we remedy issues of late discovery so neither side is prejudiced and each side has an ability to prepare?"

The court directed the prosecutor to run a rap sheet on Arratia and provide it to the defense. The prosecutor also agreed to provide the audio portion of the CAD. The court suggested having Arratia testify subject to recall so that if the defense uncovered anything, "then we can recall him and I'd give you great leeway with your cross-examination." Defense counsel rejected that suggestion. Defense counsel also rejected a suggestion that Arratia testify last. The prosecutor offered to make Arratia available for an interview after lunch but defense counsel said his investigator was not available until "later" that afternoon. The prosecutor offered to make Arratia available before trial the following morning. The court agreed that was an option "but the [d]efense is indicating they are not going to present their case out of order and I'm not going to have three or four hours where we're not doing anything on the second day of trial."

26

The trial court learned during a mid-afternoon break that defense counsel had not yet spoken to his investigator or interviewed Arratia. It stated that "[a]s I told both attorneys in chambers, this witness has come down from San Jose and is going to testify today. So I don't know how to convince you, [defense counsel], that you are going to lose your opportunity to speak with this witness if you don't avail yourself of the opportunity. I don't know if I can be anymore [*sic*] clear on this topic." The court reminded the defense that the prosecutor had agreed to stipulate to any impeachable offenses or crimes of moral turpitude "so as not to put you in a position of not being able to obtain any certified copies of convictions." The court asked if the defense would be interested in an Evidence Code section 402 hearing. Counsel replied, "I'd rather have five minutes to call my investigator."

After Tompkins testified, the court told the jury to take another break. Upon learning that defense counsel and his investigator had interviewed Arratia but had not yet listened to the one-minute recording of the 911 call, the court stated. "We've spent more time in this trial off the record than on the record. I am at my wit's end, quite frankly. I think it's disrespectful to the jury . . . . [¶] . . . I have tried to make accommodations. This gentleman from San Jose has been here. No one's talked to him because we wanted to wait for an investigator who was out of town. We offered to do a 402 hearing [and] to do it on the record if you didn't feel comfortable talking to him for making yourself a witness issue. [¶] It's my feeling that the recording of what he said will speak for itself. If you feel after you hear it you need time to call rebuttal witnesses, feel free to do so. But I have no idea why this couldn't have been done in the last 20 minutes . . . ." When Arratia finally took the stand, defense counsel declined to cross-examine him.

## 2. Analysis

California's reciprocal discovery statute "requires the prosecution to disclose to the defense, in advance of trial or as soon as discovered, certain categories of evidence 'in the possession of the prosecuting attorney or [known by] the prosecuting attorney . . .

27

to be in the possession of the investigating agencies.'"" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1133, disapproved on another ground in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22; Pen. Code, § 1054.1.) Evidence subject to disclosure includes "[t]he names and addresses of persons the prosecutor intends to call as witnesses at trial" and "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial . . . ." (Pen. Code, § 1054.1, subds. (a), (f).) The disclosures must generally be made "at least 30 days prior to the trial," but "[i]f the material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately . . . ." (Pen. Code, § 1054.7.) On a showing that a party has not complied with its obligations under the statute and that the moving party has complied with its own obligations, a court may make any order necessary to enforce its provisions, "including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order." (Pen. Code, § 1054.5, subd. (b).) The court may prohibit the testimony of a witness "only if all other sanctions have been exhausted." (Pen. Code, § 1054.5, subd. (c).) "[P]rohibiting the testimony of a witness is not an appropriate discovery sanction in a criminal case absent a showing of significant prejudice and of willful conduct." (*People v. Gonzales* (1994) 22 Cal.App.4th 1744, 1747, 1758 (*Gonzales*).)

The trial court did not abuse its discretion in denying defendant's motion to exclude Arratia's testimony. The prosecutor sent Grasmuck to locate and interview Arratia almost immediately after he learned about the 911 call. He disclosed the CAD printout and Grasmuck's supplemental report soon after. (Pen. Code, § 1054.7.) The trial court expressly found that there was "no personal game playing" and no intentional failure to disclose evidence. (*Gonzales*, *supra*, 22 Cal.App.4th at p. 1758.) It follows that there was no violation of the reciprocal discovery statute. (*People v. Hammond* (1994) 22 Cal.App.4th 1611, 1624 (*Hammond*) [where there was "absolutely nothing in

28

the record that would support a conclusion of willfulness," trial court properly found no discovery violation and properly permitted prosecution to call previously undisclosed rebuttal witness whose testimony did not became relevant until defense witness testified.].) Thus, no sanction was warranted.

Defendant argues that the trial court abused its discretion in failing to grant a continuance. We disagree.

"Continuances shall be granted only upon a showing of good cause." (Pen. Code, § 1050, subd. (e).) When a continuance is sought in the midst of trial, the trial judge " ' "must consider not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion." ' [Citations.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 840 (*Samayoa*).) " 'The burden is on [the defendant] to establish an abuse of judicial discretion . . . .' [Citation.] '[A]n order of denial is seldom successfully attacked.' [Citation.]" (*People v. Beeler* (1995) 9 Cal.4th 953, 1003, abrogated on another ground as noted in *People v. Pearson* (2013) 56 Cal.4th 393, 461-462.)

Here, the trial court carefully considered the *Samayoa* factors. The court gave defendant ample opportunity to prepare to meet the evidence. It did so without unduly burdening the jury, other witnesses, or the trial process. Defendant and his investigator had the opportunity to review Arratia's rap sheet, to listen to the recording of his 911 call, and to interview him before he testified. Defense counsel did not explain why he needed additional time or how that extra time would benefit the defense. No abuse of discretion appears. (*Samayoa*, *supra*, 15 Cal.4th 795, 840.)

Defendant complains that the trial court unfairly applied the "identical" standard in allowing the defense to present Tompkins's testimony and in allowing the prosecution to present Arratia's testimony. He argues that the court should have taken into account that Tomkins was discovered and disclosed "3 or 4 days before jury selection began, and

29

almost a week before the witness would be testifying," whereas "[t]he sudden disclosure of Arratia presented a very different and strikingly unfair circumstance . . . ."

We see no abuse of discretion. We are not persuaded by defendant's argument that "the lapse of time alone—a whole year—made the admission of [Arratia's] testimony unfairly prejudicial" because defendant could have "scant hope" of remembering the cause of his erratic driving. We doubt that defendant's memory would have been sharper had the disclosure been made 30 days earlier, as the discovery statutes contemplate. (Pen. Code, § 1054.7.) Even if defendant's memory had faded, the defense could have cross-examined Arratia about the "entirely innocent" explanations defendant now suggests caused his erratic driving. The defense could have asked Arratia about traffic conditions generally. It could have asked him if there was a driver in front of defendant who "might have created a hazard" that required defendant to brake suddenly. Given Arratia's testimony that he was "right behind" defendant from about a quarter of a mile north of Moss Landing "[p]retty much [to] the . . . Castroville/Salinas exit," the defense could have asked him whether he saw defendant using a cell phone. The defense chose instead to forego cross-examination.

Defendant argues that a brief continuance "would have revealed the strong exculpatory inferences to be drawn from [Arratia's] testimony, inferences that might very well have led to [defendant's] acquittal." He asserts that he called Mitchell from his cell phone "at about th[e] same time" Arratia saw him driving erratically in the area of Moss Landing. He argues that this evidence supported an "entirely reasonable" inference that he and Mitchell arrived at the bridge at least an hour before Grasmuck did, which gave them "plenty of time to become intoxicated" at the bridge.

There are a number of problems with this argument. The record does not reveal when defendant called Mitchell or where he called him from. Defendant's assertion about the timing of his call and the conclusions he draws from that timing are entirely speculative. The record also does not reveal how long defendant and Mitchell remained

30

at Mitchell's house before they left for the bridge.  The fact that defendant may have had "plenty of time" to drink at the bridge does not establish that he was not already intoxicated when he arrived there.  We reject defendant's assertion that a brief continuance would have allowed his counsel to prepare cross-examination that would have revealed "strong exculpatory inferences" to be drawn from Arratia's testimony.

To the extent defendant suggests that *Brady v. Maryland* (1963) 373 U.S. 83 required earlier disclosure of the 911 call evidence, we reject the contention.  "The holding in *Brady v. Maryland* requires disclosure only of evidence that is both favorable to the accused and 'material either to guilt or to punishment.'  [Citations.]"  (*United States v. Bagley* (1985) 473 U.S. 667, 674.)  "Favorable evidence includes both evidence that is exculpatory to the defendant as well as evidence that is damaging to the prosecution, such as evidence that impeaches a government witness."  (*People v. Uribe* (2008) 162 Cal.App.4th 1457, 1471-1472.)  Arratia's testimony was not favorable to the defense, so the belated disclosure of his identity information was not a *Brady* violation.

Defendant argues that the trial court's denial of his motion for a continuance violated his constitutional right to due process and a fair trial.  We disagree.  The motion was properly denied.  There is no predicate on which to base a claim of constitutional error.  (*People v. Gurule* (2002) 28 Cal.4th 557, 656.)

### D.  Claimed Ineffective Assistance of Counsel

Defendant claims his counsel rendered ineffective assistance because he failed to move to suppress "the evidence obtained by the officer through violation of [his] Fourth Amendment right to be free from unreasonable search and seizure" and also failed "to conduct minimal legal research into the elements of criminal trespass and the element of lawful performance of duties."  We disagree.

A defendant seeking reversal for ineffective assistance of counsel must prove both deficient performance and prejudice.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 218;

31

*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)  The first element "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  (*Strickland*, at p. 687.) "Second, the defendant must show that the deficient performance prejudiced the defense."  (*Ibid*.)  A court deciding an ineffective assistance claim does not need to address the elements in order, or even to address both elements if the defendant makes an insufficient showing on one.  (*Id*. at p. 697.)

Defendant cannot show deficient performance here.  We have determined that Grasmuck's actions were lawful.  Defendant was not detained.  There was no basis for a suppression motion.  The failure to make a meritless claim is not deficient performance. (*Strickland*, *supra*, 466 U.S. at p. 676.)

### E.  Denial of *Pitchess* Motion

Defendant asks us to review the sealed transcript of the hearing on his *Pitchess* motion for discovery of police officer personnel records, which the trial court denied.

### 1.  Background

Defendant moved for broad discovery of records from Grasmuck's personnel file, including records relating to "falsifying police reports, tampering with evidence, or otherwise over-reaching to make a case . . . ."  The accompanying declaration of his trial counsel asserted that defendant disputed Grasmuck's report of threats made during the ride to the CHP office and that defendant planned to use any evidence discovered to "to cross-examine and impeach Officer Grasmuck at trial."  In lieu of a statement of facts, defendant referred the court to his counsel's declaration and to Grasmuck's police report.

The police report's two-page summary of the facts described the ride to the CHP office in Salinas as follows.  "As I was transporting Mr. Jester to the Monterey Area Office, he continually shouted insults at me.  After each insult (you're a cocksucker, you're a mother fucker, you son of a bitch you didn't have to arrest me . . . ), he would

apologize. He would try and appeal to my sense of fairness for a few minutes, and he routinely offered to give me a free skydiving lesson. After a few minutes he would become enraged again. Mr. Jester's mood swings continued throughout the encounter. About halfway to the office, Mr. Jester began to threaten me and my family. He said he would find me on Facebook and find out everything about me. He said he would look me up on the internet and find my wife. He said he would befriend my wife, and then fuck her in the ass. Mr. Jester repeated variations on his threats over and over on our way to the Area Office." Grasmuck's report also described what occurred after they arrived at the CHP office. "While completing my paperwork Mr. Jester made a very specific threat. He said he was going to find me, find my family and fuck me up. He was going to use the internet and find out everything about me including where I lived and all of my family members. He said he was going to 'Fuck up you and your shallow life.' Because . . . the tone and intensity of the threat had changed, I charged him with 69PC—Threats against a peace officer and 422PC—Terrorist threats.

"Officer J. Geer, ID 19640, responded to the area office and took possession of Mr. Jester and the marijuana found in his car. Officer Geer transported Mr. Jester to the Monterey County Jail for booking. While en-route, Mr. Jester related that he didn't really threaten me, he only said he was going to look me up on Facebook."

The declaration of defendant's trial counsel stated that Grasmuck's "account of Mr. Jester's statements is false in material respects. Specifically, Mr. Jester asserts that he never told Officer Grasmuck that he would look him up on Facebook, that he would befriend his wife, or have any type of sexual contact with her. Mr. Jester never told Officer Grasmuck that he was going to 'fuck up you and your shallow life.'" "Mr. Jester asserts that those statements were not made and are not true."

At the hearing on the motion, the trial court commented that defendant's showing of good cause was insufficient "based on what's been presented to the Court so far." Defendant's trial counsel argued in response that good cause was shown because

33

Grasmuck was "the only person" who could provide competent evidence about the threats, since no one else heard them. "And because of that, we believe that it is important to obtain materials that would reflect on his character and any previous false statements and police report[s] of false testimony that he made."

The trial court denied the motion. The court explained that "simply saying I didn't say exactly that would not be sufficient to even give the Court a basis to start nosing into the personnel file."

### 2. Analysis

A criminal defendant has a limited right to discovery of peace officer personnel records. (*Pitchess*, *supra*, 11 Cal.3d at pp. 537-538; Evid. Code, §§ 1043-1047; Pen. Code, §§ 832.5, 832.7-832.8.) "The procedure requires a showing of good cause for the discovery, an in camera review of the records if good cause is shown, and disclosure of information 'relevant to the subject matter involved in the pending litigation.' [Citation.]" (*People v. Thompson* (2006) 141 Cal.App.4th 1312, 1316.) "Good cause for discovery exists when the defendant shows both ' "materiality" to the subject matter of the pending litigation and a "reasonable belief" that the agency has the type of information sought.' [Citation.]" (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1016 (*Warrick*).) "To show the requested information is material, a defendant is required to 'establish not only a logical link between the defense proposed and the pending charge, but also to articulate how the discovery being sought would support such a defense or how it would impeach the officer's version of events.' [Citation.]" (*Garcia v. Superior Court* (2007) 42 Cal.4th 63, 71 (*Garcia*).) "Counsel's affidavit must also describe a factual scenario that would support a defense claim of officer misconduct. [Citation.]" (*Ibid.*) The good cause threshold is "relatively low." (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 83.) "What the defendant must present is a specific factual scenario of officer misconduct that is plausible when read in light of the pertinent documents." (*Warrick*, at p. 1025.) "Depending on the circumstances of the case, the

34

scenario may be a simple denial of accusations in the police report or an alternative version of what might have occurred." (*Garcia*, at p. 72.)

"A motion for discovery of peace officer personnel records is addressed to the sound discretion of the trial court, reviewable for abuse." (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039.)

Here, defendant posited a specific factual scenario. He asserted that Grasmuck fabricated the threats, falsified his police report with them, and testified falsely about them at the preliminary examination "to improperly bolster his case." That scenario was not plausible "when read in the light of the pertinent documents," which included defendant's statement to Geer that he "didn't really threaten [Grasmuck but] only said he was going to look him up on Facebook." (*Warrick*, *supra*, 35 Cal.4th at p. 1025.) Defendant's statement that he "didn't really threaten" Grasmuck does not support an inference that Grasmuck fabricated the threats. It suggests instead that defendant belatedly recognized that his statements to Grasmuck could have been interpreted as threats. Defendant's statements to Geer undermined defendant's assertion through his counsel that Grasmuck falsified his police report.

Nowhere in defendant's counsel's declaration are defendant's statements to Geer explained or acknowledged. Defendant does not deny that he made those statements. He does not claim that Geer or Grasmuck fabricated them. He asserts no misconduct at all on Geer's part. He did not seek to discover documents from Geer's personnel file. Defendant's factual scenario is internally inconsistent because his counsel's declaration contradicts defendant's own statements to Geer. (Compare *People v. Thompson*, *supra*, 141 Cal.App.4th at pp. 1317-1318 [factual scenario "not internally consistent or complete" where the defendant failed to provide an alternate version of the facts and "d[id] not explain his own actions in a manner that adequately support[ed] his defense"] with *Warrick*, *supra*, 35 Cal.4th at p. 1027 [good cause established by plausible if not entirely convincing alternative version of the facts; scenario that defense counsel's

35

declaration described was internally consistent where any conflicts with the police report supported the defendant's allegations that police fabricated facts in the report.)  Because defendant failed to describe a specific factual scenario of officer misconduct that was plausible when read in light of the pertinent documents, he failed to establish good cause for the requested discovery.  His *Pitchess* motion was properly denied.

## F.  Cumulative Error

Defendant contends that the cumulative effect of the trial court's errors deprived him of a fundamentally fair trial.  As we have found no error, his claim fails.  (*People v. Cooper* (1991) 53 Cal.3d 771, 839.)

## III.  Disposition

The judgment is affirmed.

_____
Mihara, J.

WE CONCUR:

_____
Premo, Acting P. J.

_____
Márquez, J.